UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

**FILED - GR**
May 9, 2024 1:47 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: KB   SCANNED BY: ___KB / 5/9___

JON PAUL RUTAN

                    Plaintiff,

    v                                          Civil Action No.
                                               Judge

MARNEY CAST, HILLSDALE                         **1:24-cv-488**
COUNTY CLERK, ABE DANE,                        **Paul L. Maloney**
HILLSDALE COUNTY DEPUTY                        **United States District Judge**
CLERK, BRENT LEININGER,
HILLSDALE COUNTY
COMMISSIONER, DISTRICT 5,
STEPHENIE KYSER, HILLSDALE
COUNTY TREASURER, SCOTT
HODSIRE, HILLSDALE COUNTY
SHERIFF, MICHELLE BIANCHI,
HILLSDALE COUNTY PROBATE
COURT JUDGE, MICHAEL OLSAVER,
LENAWEE COUNTY CIRCUIT
COURT JUDGE, ANDREW FINK,
STATE REPRESENTATIVE, JOHN
DOES 1-25 AS FOUND BY
DISCOVERY.

                    Defendants.

_____/                   JURY TRIAL DEMAND

Jon Paul Rutan
2228 Pondbrooke Dr.
Hillsdale, MI 49242
(517) 320-1383
rutanjonp@gmail.com
In Propria Persona

_____

*There is no other pending or resolved civil action arising out of the transactions or occurrences
alleged in this complaint.*

        **NOW COMES** Plaintiff, JON PAUL RUTAN, appearing pro se, and hereby lodges this

Complaint against the Defendants, encompassing their personnel, representatives, and those who

1

may succeed them in their official capacities. Plaintiff avers the ensuing facts in substantiation of this complaint, grounded on available information and reasonable belief:

## Complaint

1. In the latter months of 2019, the Plaintiff, having obtained the Party's bylaws, uncovered misinformation propagated by Party officials.

2. Utilizing regulatory guidelines, a new group, henceforth referred to as the New Faction, aimed to assume control of the Hillsdale County Republican Party.

3. Leveraging bylaws, the New Faction meticulously recruited candidates for Precinct Delegate positions during the 2020 electoral process.

4. In collaboration with individuals such as Jon Smith and Lance Lashaway, the Plaintiff conceptualized an emblem and articulated principles to define Republican identity.

5. Following the 2020 elections, newly elected Precinct Delegates installed a new slate of officers.

6. However, the incumbent County officials, termed the Old Faction, vehemently opposed, and refused to endorse the New Faction.

7. In late 2021, Treasurer Josh Gritzmaker was made aware of clandestine meetings by the Old Faction members, purportedly planning to supplant New Faction leadership and Precinct Delegates in the following year.

8. In October 2021, Tim Martin, a former Party member, disclosed to Josh Gritzmaker information about Old Faction officials planning to remove New Faction leadership in 2022.

9.  Despite initial skepticism, Mr. Gritzmaker dismissed the information, considering it incredulous.

10.  Mr. Gritzmaker, relatively new to local politics, engaged out of genuine interest in conservative community involvement.

11.  Subsequent investigations validated rumors, implicating Defendants MARNEY KAST, STEPHENIE KYSER, MICHELLE BIANCHI, BRENT LEININGER and ABE DANE in reducing Precinct Delegate allocations.

12.  Defendants engaged in soliciting County personnel and associates to enroll as Precinct Delegates during office hours.

13.  In Spring 2022, tardy paperwork led to a reduction in Precinct Delegate allocations.

14.  Defendant MARNEY KAST, along with other Election Board members, orchestrated this reduction as punitive reprisal.

15.  This departure from established protocol contradicted precedents in Hillsdale and neighboring counties.

16.  Further scrutiny revealed unprecedented actions compared to other Michigan counties.

17.  Traditional responses to tardy submissions maintained delegate counts, unlike the punitive measures in Hillsdale.

18.  Communications with other counties highlighted standardized practices differing from those in Hillsdale.

19.  No precedent exists where tardy submissions warranted punitive measures.

20. On May 6, 2022, errors led to the invalidation of numerous Affidavits of Identity of New Faction members, with no opportunity for rectification.

21. Disqualifications occurred despite submissions weeks before the deadline and reliance on Defendant assistance.

22. Over 50 first-time delegate applications from the Old Faction were accepted.

23. Disqualified applicants were previous delegates or party members.

24. Interviews with county clerks underscored deviations from standard practices.

25. Interviews revealed coercion tactics and misinformation regarding precinct delegate roles.

26. Affidavits of Identity submitted in March, and then on May 6, 2022, were invalidated due to errors.

27. Defendant MARNEY KAST received numerous Affidavits of Identity from the Old Faction close to the deadline.

28. Non-primary executive members, including Defendants SCOTT HODSHIRE, MARNEY KAST and BRENT LEININGER, appeared as precinct delegates, violating party norms.

29. Such actions suggest ulterior motives and a role in conspiring against constituents.

30. Discrepancies arose regarding Defendant MARNEY KAST's precinct delegate application, raising transparency concerns.

31. Defendant SCOTT HODSHIRE displayed a lack of understanding of precinct delegate roles.

32. Defendant ABE DANE coerced individuals to apply as precinct delegates despite their reluctance.

4

33.  Defendants MARNEY KAST and ABE DANE assisted in the invalidation of Affidavits of Identity.

34.  Several applications invalidated were completed with Defendant assistance.

35.  Defendant ABE DANE obstructed a candidate's completion of required procedures.

36.  New Faction candidates resorted to filing Write-In Affidavits after disqualifications.

37.  The New Faction disavowed Old Faction members prior to the August Primary Election.

38.  Disavowal disqualified Old Faction candidates from Republican contention.

39.  Disavowed candidates won delegate elections, skewing the ballot.

40.  The fall convention proceeded as planned, despite potential aggression.

41.  Defendant SCOTT HODSHIRE spread false information about an anticipated raid.

42.  Police presence prompted security measures.

43.  MIGOP warned against disavowal proceedings, citing potential punishment.

44.  MIGOP recognized the New Faction as legitimate.

45.  Defendant BRENT LEININGER convened a meeting to remove party leaders.

46.  Notifications were withheld from key individuals, contrary to bylaws.

47.  Both Factions dispatched delegates to the State Convention.

48.  A resolution called for censuring the Old Faction.

49.  The resolution received widespread approval.

50.  The resolution advocated for recognizing David Mosby Jr. as the legitimate chair.

51. The resolution was presented at the State Convention.

52. Evidence of irregularities in a previous meeting was presented.

53. Defendant MICHAEL OLSAVER ruled against the New Faction.

54. MIGOP continued to recognize the New Faction.

55. Defendant BRENT LEININGER sent a fictitious slate of Delegates to the March 2, 2024 State Convention.

56. A verbal agreement was made to raise delegate allocation.

57. Defendant BRENT LEININGER reduced delegate allocation contrary to his word.

58. New Faction candidates faced obstacles in obtaining necessary paperwork in 2024.

59. Defendants are rumored to interfere with Precinct Delegate elections and County elections.

60. Defendants withheld essential paperwork from the New Faction.

61. Defendants aim to establish an alibi for past actions.

62. Judicial intervention may be necessary to address inequities.

63. Investigations or restraints may be warranted.

## II. Conclusion

In light of the foregoing, Plaintiff seeks prompt judicial intervention to address the alleged injustices perpetrated by Defendants, prior to a jury trial.

### **Allegations**

1.   This action arises under 42 USC 1983. Jurisdiction is conferred by 28 USC 1331, 1343(a)(3), and (4).

2.   In the latter part of 2019, the Plaintiff successfully acquired the bylaws of the Party, thereby uncovering the dissemination of misinformation perpetuated by the Officers and Representatives.

3.   Empowered by these regulatory guidelines, a contingent of fresh recruits endeavored to wrest control of the Hillsdale County Republican Party, henceforth referred to as the New Faction.

4.   Leveraging the provisions delineated in the bylaws, members of the New Faction meticulously recruited candidates to stand as Precinct Delegates for the Party during the electoral proceedings of 2020.

5.   Collaboratively with Jon Smith, and Lance Lashaway, Plaintiff designed a distinctive emblem, while concurrently formulating a declarative statement of principles to elucidate the essence of Republican identity.

6.   Following the electoral triumph of 2020, the newly elected Precinct Delegates proceeded to elect a slate of novel officers.

7.   However, the incumbent County Elected officials and their adherents, hereinafter termed the Old Faction, vehemently contested, and abstained from endorsing the nascently formed New Faction.

8.   In the waning months of 2021, Treasurer Josh Gritzmaker was apprised of clandestine gatherings convened by members of the Old Faction, purportedly strategizing to supplant the New Faction leadership and their affiliated Precinct Delegates in the ensuing year.

7

9.   In October 2021, Tim Martin, a former member of the Party and an Army Veteran, visited Josh Gritzmaker's residence to discuss a roofing job. Mr. Martin and Mr. Gritzmaker shared a positive relationship characterized by mutual respect. During their interaction, Mr. Martin informed Mr. Gritzmaker about a gathering of elected officials from the Old Faction group who were allegedly devising a plan to remove all New Faction leadership in 2022.

10.  Mr. Gritzmaker somewhat dismissed the information, perceiving it as somewhat ludicrous. He found it incredulous that individuals purportedly representing the community would engage in such trivial behavior. Consequently, he chuckled at the notion, demonstrating a lack of concern for the perceived pettiness of others. His recent assumption of the Treasurer role, undertaken merely weeks prior to assist the group, contributed to his nonchalant response.

11.  At that juncture, Mr. Gritzmaker was relatively inexperienced in the realm of local politics. His burgeoning engagement stemmed from a genuine desire to participate and contribute to the conservative movement within the community.

12.  Subsequent inquiries substantiated the veracity of these rumors, particularly implicating Defendant MARNEY KAST, a prominent member of the Old Faction and the County Clerk, in orchestrating a reduction in the county's Precinct Delegate allocations.

13.  Several instances were documented wherein Defendant MARNEY KAST and Defendant ABE DANE, during official working hours, engaged in soliciting predominantly County personnel and their familial associates to enlist as Precinct Delegates.

14. In Spring of 2022, the secretary of the party Jon Smith submitted the paperwork late on the delegates requested for the upcoming primary election. The county election committee consisting of the County Clerk, Defendant MARNEY KAST, Treasurer, Defendant STEFENIE KYSER, and Probate Court Judge, Defendant MICHELLE BIANCHI punished the late submitted Precinct Delegate Allocation by reducing delegates from 133 to 100 for the republican party.

15. In making that decision a select few "spectators" were in attendance; Defendant ABE DANE, Defendant SCOTT HODSHIRE, Glen and Margaret Frobel.

16. Defendant MARNEY KAST, in collusion with other members of the County Election Board, exploited their official capacities to diminish the Precinct Delegate allocations in Hillsdale County from 133 to 100, ostensibly as punitive reprisal for a belated paperwork submission by the Secretary of the New Faction, Jon Smith.

17. This divergence from established protocol contravened past precedents observed in Hillsdale and neighboring counties, where tardiness in paperwork submission did not precipitate a reduction in Precinct Delegate allocations.

18. In further review of these actions with communication with other counties around the state this action in Hillsdale was unprecedented.

19. Traditionally, in instances where paperwork has been submitted tardily, and historical precedence exists where similar oversights have occurred across the state, the standard practice has been to maintain the delegate count at its previous level, neither augmenting nor diminishing it.

20. In all correspondences with other counties in Michigan, the rationales for reducing delegates consistently adhered to two primary factors: Firstly, a deliberate

9

request by the county party for a reduction, or secondly, compelling demographic shifts identified through recent census data, precipitating a reduction in delegates proportionate to population changes in the region. It is notable that no precedent exists wherein tardiness in submission has been wielded as a punitive measure against a county party.

21.   On May 6th, 2022, the prescribed deadline for submitting affidavits of identity to qualify for the August 2022 primary election for precinct delegate positions elapsed. On this date, 26 ballots were invalidated due to various errors or perceived insufficiencies. Examples of these errors encompassed the failure to designate "1" in the precinct number box, omission of the notary's date of notarization despite being stamped over a dated area where the application was signed, and omission of marking the "republican box," among others.

22.   All the applications that were rejected had been submitted between 4 to 8 weeks before the deadline. Disqualification on the deadline date itself left the applicants with no opportunity to rectify the errors and resubmit their applications. The notifications of rejection were sent via USPS mail during the week following the deadline. It's noteworthy that some of the applicants who faced disqualification had sought assistance from Defendant MARNEY KAST and Defendant ABE DANE at the County Clerk's office.

23.   Over 50 first time precinct delegate applications were accepted by the clerk for the Old Faction.

24.   Each applicant removed on the deadline was either a previous or current precinct delegate, or an active member in the Republican Party.

25.  During interviews with a significant number of county clerks across Michigan, several key observations were made:

- The majority indicated their willingness to assist individuals with their applications on the day of submission, ensuring completeness and accuracy prior to acceptance.

- All clerks unanimously asserted that they would never delay the review process until the deadline day.

- A minority mentioned that they do not strictly require the notary to sign the date if it is already stamped on the application by the applicant.

- Most clerks stated that they do not mandate the filling out of the precinct delegate box for most rural areas, as it typically remains constant at "1." Exceptions to this practice were noted in Hillsdale city and Somerset.

- Many clerks expressed amusement or disbelief when asked if they would hold applications for review a month later, suggesting that such a delay was highly irregular in their professional experience.

26.  During June and July of 2022, Josh Gritzmaker reached out and interviewed numerous "new" applicants. As an executive member, a current precinct delegate, and activist in the state of Michigan, he was eager to meet these individuals but also harbored suspicions about their motivations. Some of the responses he received during these interviews included:

1.  "I was told by Andrew Fink I needed to do this."
2.  "I was asked to hold a spot."
3.  "I was told by the clerk's office this is how you join the Republican Party."

11

4.   "I can do whatever I want."
5.   "I am a member of the Republican Party." (even though they were never a member)
6.   "I was told by a commissioner to do this to take back the party from the 'radicals.'"

27.  On May 7, 2022, nearly all the Affidavits of Identity submitted were invalidated due to errors, with correspondence notifying the Precinct Delegate candidates, including the Plaintiff, dispatched two days subsequent to the deadline for resubmission.

28.  During the final registration days, Defendant MARNEY KAST received more than 70 Affidavits of Identity from the Old Faction, of which 62 comprised County Elected officials, their office staff, and kinfolk.

29.  Non-primary executive members: Defendant SCOTT HODSHIRE, Defendant BRENT LEININGER and Defendant MARNEY KAST were on the ballot as precinct delegates.  This is bad form and non-standard practice of elected officials who are mandated to be on the executive board of the republican party, they are Official Elected Members of the Executive Board, and are Delegates at Large that already have a vote at County Conventions and are taking an open spot away from a constituent.

30.  If they were up for re-election, it is standard practice to do this, because if they lose their race but still win the Precinct Delegate position they still get to be involved, however in 2022 for these 3 individuals that is not the case.

31.  It appears there might be some discrepancy between what Marney Kast stated and the actual practice regarding her application as a precinct delegate. If she stated that she always runs as a precinct delegate despite evidence to the contrary, it could raise questions about her motivations or the transparency of the process. It's important for party

members to uphold honesty and integrity in their actions, especially when it comes to representing constituents within the party.

32.  It seems that Defendant SCOTT HODSHIRE's response reflects a misunderstanding or lack of awareness regarding the standard practices and ethical considerations surrounding the role of precinct delegates. While there might not be a specific legal prohibition against elected officials running for precinct delegate positions, there are generally accepted norms and ethical standards within political parties that discourage such actions.  Defendant SCOTT HODSHIRE's lack of response after being educated on the matter suggests that he may have other motives and a primary role in the conspiracy to deprive his constituents of Constitutionally protected rights.

33.  Many individuals were coerced by Defendant ABE DANE to apply as Precinct Delegates merely to "hold the slot," despite their reluctance to partake in such roles.

34.  Notably, two Affidavits of Identity invalidated were completed in the presence and with the assistance of Defendant MARNEY KAST and Defendant ABE DANE.

35.  One was for Danielle Mentz and the other was for Ralph Riley.

36.  Chris Wingate received notification from Defendant MARNEY KAST instructing him to visit the Clerk's office to affirm his U.S. citizenship by checking the designated box. Subsequently, on the final day of filing, Mr. Wingate presented himself at the office to fulfill this requirement. However, Defendant ABE DANE, purportedly, declined Mr. Wingate's request to undertake the affirmation, thereby obstructing his completion of the necessary procedural step.

37.  Subsequently, in June 2022, the affected New Faction Precinct Delegate candidates resorted to filing Write-In Affidavits to vie as write-ins.

13

38. In response to these illicit maneuvers, the New Faction executive committee convened a meeting to disavow all members of the Old Faction and individuals implicated in the illicit activities from the Local Party, most of whom had exhibited negligible attendance at meetings or events since 2019.

39. This disavowal transpired prior to the August Primary Election, thereby disqualifying the Old Faction candidates as Republican contenders on the ballot.

40. The majority of the disavowed won their precinct delegate elections, and with 26 thrown out didn't create a fair "fight" at the ballot box between the 2 factions. This must have been the idea that the Defendant Conspirators were secretly meeting about and yearning to achieve in 2021 (see above).

41. The fall convention was called properly and communicated through the clerk's office. The disavowed group was told by Defendant Conspirators to show up to the convention regardless of the disavowed letter they received.

42. Information filtered back to the leadership of the venue where the sanctioned Convention was going to be held, that there could be aggression and liability to the building with tensions high leading up to this event. The New Faction at that time was asked to purchase liability insurance and have security on the grounds if they were to use that space, with no time to spare to change venues, the New Faction agreed and got the insurance and security measures in place as required by the venue.

43. Defendant SCOTT HODSHIRE disseminated erroneous information pertaining to an anticipated raid during the August 2022 Hillsdale County Republican Convention, purportedly leading to multiple arrests.

44.  Witnesses attested to the presence of at least two police transport vans from neighboring jurisdictions in the vicinity during the convention, prompting Plaintiff and convention attendees to engage security personnel to ensure order, a responsibility typically incumbent upon the Sheriff by oath.

45.  Consequently, the Old Faction convened a rump Convention at an alternative location, coinciding with the time of the State-sanctioned New Faction convention.

46.  Hillsdale County Sheriff's Deputies patrolled the area, amidst threats of arrest made against New Faction Precinct Delegates.

47.  The MIGOP had been notified of all of this and what was transpiring in Hillsdale.  They informed the party leadership if they plan to carry out the disavowed process from the county convention and a rump convention was to take place, there would be punishment for conducting this plan.

48.  They notified the New Faction that it would be a minor election law violation and they would review and a punishment they deem necessary would be enforced.

49.  The leadership did follow through and only denied two of the disavowed delegates from entering the facility after the rump convention had started.

50.  No other Old Faction Precinct Delegates attempted to come up and get credentialed or enter the facility.

51.  A rump convention lead by Defendant BRENT LEININGER with his homemade gavel proceeded to lead the disavowed delegates in convention.

52.  The MIGOP then punished the republican party as the party anticipated they would be, by accepting the rump convention delegates to go to the State Convention.  This was the only strike the New Faction was to have.  If the New Faction

15

was to violate any further bylaws or state election rules/laws, the New Faction would be disavowed/censured by the MIGOP.  The New Faction agreed and accepted the punishment.

53.  Approximately a week later, the Old Faction convened anew, this time officially, without proper notification, and ousted the New Faction party officers, installing themselves as the new officers, thereby mirroring the actions they had previously decried the New Faction executive committee of undertaking.

54.  August 25th, 2022, Defendant BRENT LEININGER, and the Old Faction called an executive meeting to remove all leaders of the party and install their chosen leadership to finish the 2022 term.  There is no provision for this in the local or State bylaws.

55.  Notifications of this meeting were not received by Lance Lashaway (VC), Josh Gritzmaker (Treasurer) or Jonathan Lindsey (nominee for new state senate district)

56.  Both Factions dispatched Delegates to the State Convention in August of 2022 to deliberate on matters concerning the State Party.

57.  Vice Chair Lance Lashaway petitioned the State Party, bolstered by unanimous support from the entire assembly, to have the Old Faction party Delegates removed.

58.  As a conciliatory measure, the State Party consented to sanctioning the New Faction party, albeit allowing the Old Faction Precinct Delegates to vote, owing to time constraints.

59.  Because according to the bylaws the 8/25/2022 meeting was null and void, then MIGOP chairman Ron Weiser agreed, and did not allow MIGOP to recognize the Old Faction. (letter signed by Ron on 8/27/2022)

60.  In September 2022, a member of the Old Faction filed a police report alleging criminal wrongdoing against the officers of the New Faction for purportedly denying them access to the August County Convention.

61.  This report prompted an investigation by Detective Brad Martin of the Hillsdale City Police Department, culminating in a submission of findings to the Michigan Attorney General, Dana Nessel, who subsequently declined prosecution.

62.  In September 2022, Defendant BRENT LEININGER initiated a civil suit against the Plaintiff and five other officers of the Hillsdale Republican Party. Owing to Defendant BRENT LEININGER's concurrent role as a Hillsdale County Commissioner, the three judges in Hillsdale County recused themselves from the proceedings.

63.  Consequently, the Region II State Court Administrator's office appointed Defendant MICHAEL OLSAVER as the "Judge on assignment" to preside over the Hillsdale County 1st Circuit Court.

64.  The Plaintiff was served with the Complaint and Summons by Defendant BRENT LEININGER merely days prior to the scheduled Zoom Hearing.

65.  Antecedent to the hearing, the Plaintiff lodged a MCR2.116(c)(10) motion with the court, invoking the Political Question Doctrine, the Doctrine of Unclean Hands, and arguing lack of standing due to Defendant BRENT LEININGER's failure to exhaust administrative remedies.

66.  Defendant MICHAEL OLSAVER acceded to an oral motion by Defendant BRENT LEININGER's counsel for a 14-day extension to respond to the Plaintiff's motion.

67.  Despite the invocation of legal doctrines and procedural objections, Defendant MICHAEL OLSAVER, tethered to the Hillsdale County Commissioners through County Contracts, adjudicated a lawsuit filed by Defendant BRENT LEININGER and the Old Faction against the New Faction party officers, thereby precluding them from assuming any official capacities in conducting the County Convention of November 2022, as directed by MIGOP.

68.  The Judge issued an order holding the New Faction officers in contempt of court if they conducted party operations or participated in party business. In light of this, the officers tendered their resignations.

69.  The legitimate Chair of the Hillsdale County Republican Party, Daren Wisely, had previously issued the call to Convention, as instructed by MIGOP.

70.  In anticipation of the November County Convention, the six officers of the Hillsdale County Republican Party resigned to avoid contravening Defendant MICHAEL OLSAVER's Order.

71.  The Precinct Delegates of the New Faction convened the November County Convention in conformity with the bylaws and Michigan Law inviting Old Faction and New Faction Precinct Delegates.

72.  Defendant BRENT LEININGER instigated correspondence via electronic mail directed to all Precinct Delegates, encouraging them to abstain from attending the Michigan Republican Party (MIGOP) endorsed County Convention at the venue specified on the State's official website. Instead, the Defendant advocated attendance at an alternative assembly, organized by himself, convened at a separate location.

18

73. During the sanctioned Convention, the Precinct Delegates elected their own temporary and permanent officers to conduct the business.

74. In December of 2022, MIGOP communicated with newly elected Hillsdale County Republican Party Chair, David Mosby Jr., directing him to conduct a County Convention in January.

75. Chair David Mosby Jr. duly issued the Call to Convention and disseminated it to Precinct Delegates of both Factions, specifying the address and time listed on the MIGOP website.

76. Defendant BRENT LEININGER dispatched an email to all Precinct Delegates from both factions instructing them to go to a rump convention that he was hosting, rather than the MIGOP sanctioned Convention being run by David Mosby Jr.

77. A hearing was convened in February, immediately preceding the MIGOP State Convention, to adjudicate on the matter of adding the six new officers to the TRO.

78. Defendant BRENT LININGER attempted to include the six new officers duly elected by the Bylaws at the December 2022 meeting in the Temporary Restraining Order.

79. Defendant MICHAEL OLSAVER denied the request, positing that the interests of the People of Michigan were best served by deferring to the State Party to arbitrate the matter, thus proving one of the issues raised in Plaintiff's MCR2.116(c)(10) spoke of in paragraph 65 above.

80. Both the New Faction and the Old Faction submitted Official Delegates and Alternate Delegates lists to MIGOP to ascertain which list would be accepted.

81.  The credentialing committee initially favored the Old Faction's Delegate lists, predicated on Defendant BRENT LEININGER's erroneous assertion that they had not been invited to the County Convention in November and January.

82.  Chair David Mosby Jr., had sent letters via USPS and emails to both side's Precinct Delegates to attend the January County Convention, although Defendant Brent Leininger sent out an email urging all Precinct Delegates to go to his rump convention, rather than the MIGOP sanctioned County Convention being held by Chair David Mosby Jr.

83.  Upon receipt of an email authored by Defendant BRENT LEININGER to the committee, a subsequent emergency meeting was convened, resulting in a reversal of their decision.

84.  The Credentialing committee ultimately endorsed the New Faction Delegate List, albeit deeming Defendant BRENT LEININGER as the Chair of the Hillsdale County Republican Party.

85.  A Resolution was introduced at the district 5 Caucus, articulating the litigious tactics employed by Defendant BRENT LEININGER and the Old Faction against the New Faction, and calling for a vote to censure them, removing Defendant BRENT LEININGER as chair, until such time as they ceased their litigious pursuits.

86.  This Resolution also recognized David Mosby Jr. as the legitimate Chair of the Hillsdale County Republican Executive Committee (HCREC).

87.  The Resolution garnered near-unanimous approval during the Caucus, and subsequently, during the State Convention where it was presented along with other District 5 business.

88.  This Resolution advocated for David Mosby Jr. to be recognized as the legitimate Chair of the Hillsdale County Republican Party.

89.  At a subsequent hearing convened by Defendant MICHAEL OLSAVER, the Resolution was presented alongside evidence demonstrating irregularities in the conduct of the August 25, 2022, meeting, wherein Defendant OLSAVER had issued his TRO. Notably, the absence of Senator Lindsey, the duly elected official, from the said meeting was highlighted.

90.  Furthermore, it was underscored that Senator Shirkey, who had attended the meeting, was erroneously accorded voting rights despite lacking such entitlement under the Bylaws of the Hillsdale County Republican Party.

91.  In August of 2023, Defendant MICHAEL OLSAVER issued his final order, opining that the State Party, under MCL169.211(6), lacked authority to designate the official local Party as stipulated by the statute. Additionally, Defendant OLSAVER ruled that Senator Lindsey was not recognized as an Official Elected Member of the Executive Committee for the August 25, 2022, special meeting due to his pending general election victory in November.

92.  This ruling, perceived as a misinterpretation of the Bylaws and State Statutes, and a disregard for established legal doctrines, underscored the need for administrative reliefs to be exhausted, as previously advocated by Defendant OLSAVER before the February State Convention.

93.  Despite the Judge's ruling favoring the Old Faction, MIGOP continued to recognize the New Faction as the legitimate local Party.

94.  Evidence of Ex Parte Communication between Defendant MICHAEL OLSAVER and Defendant BRENT LEININGER surfaced, with Defendant BRENT LEININGER boasting at an Old Faction Party meeting of his ability to install Defendant ABE DANE as the Treasurer of the Hillsdale County Republican Party on Wednesday, in contravention of the judicial order that wasn't signed until Friday.

95.  Notably, the Judge's final order was not entered into the Defendant MARNEY KAST's office as the Clerk of the Courts until Monday, with the New Faction only notified on Tuesday.

96.  The New Faction found itself ensnared in a conundrum, with MIGOP furnishing pertinent information to them, while concurrently, the judge issued an order designating the Old Faction as the legitimate local party.

97.  Consequently, the New Faction embarked on establishing a 501(c)4 Super PAC, rebranding themselves as the America First Republicans, and continued to organize community events aimed at fundraising for charitable causes, such as Toys for Tots, Jasmynns Voice and Helping Hands.

98.  Defendant BRENT LEININGER then sought to initiate contempt proceedings against members who participated in these events or publicized them on social media.

99.  Defendant MICHAEL OLSAVER, along with Defendant BRENT LEININGER and his legal representative Jonathan Lauderbach from Warner, Norcross + Judd, should be deemed to have engaged in an abuse of process through the persistent litigation, culminating in a baseless Contempt order against Josh Gritzmaker, David Mosby Jr., Jon Smith, Kristina Karamo, and the MIGOP State Executive Committee.

100. Lacking the financial means to engage legal representation for an appeal, and lacking legal expertise to draft such an appeal, none of the original six individuals placed under the Restraining Order pursued an appeal of the original TRO.

101. The three members of the New Faction charged with contempt, did however, employ legal counsel to file an appeal on the Contempt charges.

102. The appeal was denied on the grounds that Defendant MICHAEL OLSAVER'S contempt order was not a final order, as Jonathan Lauderbach had not gotten the legal fees to the judge by the date ordered, so they were absent from the order.

103. In March of 2024, Jonathan Lauderbach then contacted all defendants with a legal bill of over $43,000 just for the contempt proceedings.

104. The America First Republicans, of which the Plaintiff is a constituent, resumed their monthly meetings on the first Thursday of every month at a designated venue, while the Old Faction continued to convene under the banner of the Hillsdale County Republican Party, albeit at a different location.

105. Defendant MICHAEL OLSAVER and Defendant BRENT LEININGER, alongside his attorney Jonathan Lauderbach, a member of Warner, Norcross + Judd, stand in clear violation of the abuse of process doctrine, given the incessant litigation culminating in a spurious Contempt order against select individuals.

106. The protracted legal battles culminated in a debilitating outcome, as the original six defendants lacked the financial means and legal acumen to mount a successful appeal against the Restraining Order.

107. Undeterred by these legal tribulations, the America First Republicans are resolved to reengage in the political process, with plans to participate in the August 2024 electoral

cycle, buoyed by the consistent attendance of 60 to 150 members at their meetings, juxtaposed against the modest attendance of 15 to 20 individuals at the Hillsdale County Republican Party gatherings.

108. At the March 2024 State Convention, Defendant BRENT LEININGER sent a fictitious slate of Delegates and Alternates, and as such the New Faction slate of Delegates was accepted through the Credentialling Committee.

109. On the morning of the State Convention, Defendant BRENT LEININGER, through Suzy Avery, and in the presence MIGOP Chair Pete Hoekstra, MIGOP Vice chair Malinda Pego, Warren Carpenter, Senator Jonathan Lindsey, Jon Smith and presumed lawyers made the verbal agreement that if the New Faction would sit some of their Delegates, that he would raise the Precinct Delegate Allocation back up to 133 from the 100 that it currently is.

110. Prior to April 1st of 2024, in March, Defendant BRENT LEININGER sent the Precinct Delegate Allocation to Defendant MARNEY KAST dropping the number from 100 to 50.

111. Many of the New Faction candidates have not been getting all of the paperwork they need to run for elected offices from the Clerk's office, and many candidates have had their paperwork refused by Defendant ABE DANE with no assistance from that office.

112. Now that campaign season is underway, the present circumstances entail Defendants MARNEY KAST and Defendant ABE DANE, employed within the County Clerk's office, withholding essential documents required by the New Faction to pursue elected positions.

113. The Defendants have been rumored to have been conspiring again to interfere with the Precinct Delegate election and are now boldly doing the same for government positions.

114. In a manner akin to the circumstances observed in the year 2022, wherein certain individuals affiliated with a newly formed faction sought to procure the requisite paperwork from the Clerk's office to pursue candidacy for an elected position, it was noted that the absence of Defendants MARNEY KAST and ABE DANE resulted in the staff withholding the necessary forms for ballot filing. Contrary to the provisions outlined in MCL50.64, these individuals were instructed to return at a later time when either of the aforementioned Defendants would be present in the office.

115. Lance Lashaway, a member of the aforementioned new faction, endeavored on three occasions to submit his candidacy paperwork for the position of County Commissioner, only to be informed that his presence would be required during the tenure of either Defendant from said office. Mr. Lashasway succeeded in his fourth attempt.

116. Contrary to established precedent and the practices observed in Clerk's offices across the State, Defendant DANE maintains the belief that once an Affidavit of Identity has been signed in the "reviewed by" section of the form, subsequent reviews by the Defendant's office are permissible, even after the stipulated cutoff date. In the event of an error identified during subsequent reviews, it is asserted that the Affidavit of Identity may be invalidated, resulting in the candidate's exclusion from the Primary Ballot.

117. Defendant Dane has undertaken the extraordinary measure of displaying a sign at the Clerk's counter indicating that the Clerk's office will refrain from assisting

individuals with election paperwork, thus deviating from the established norms of the office.

118. In light of the Plaintiff's transparent approach to initiating legal proceedings, the actions undertaken by Defendant DANE appear to be aimed at establishing an alibi for purportedly unlawful activities undertaken in the year 2022.

119. The equitable recourse available to the New Faction, in order to attain a semblance of parity against the entrenched Old Faction, which commands authority over all elected offices, appears to necessitate judicial intervention.

120. Such intervention should take the form of a prompt court-ordered investigation into the alleged transgressions or, alternatively, the imposition of restraints prohibiting further interaction between the Defendants and the Plaintiff and the New Faction until such time as oral arguments can be convened and adjudicated.

## PARTIES

1.    At all relevant times hereto, Defendant MARNEY KAST was acting under color of law, in her individual and official capacities, and within the course and scope of her employment as County Clerk/ Election Board Member for the County of Hillsdale. She is being sued in her individual and official capacities.

2.    Defendant Hillsdale County Clerk's office is a municipal corporation with its principal offices located at 29 North Howell Street, #1, in Hillsdale, Michigan.

3.    Defendant County of Hillsdale is a municipal corporation with its principal offices located at 33 McCollum Street in Hillsdale, Michigan, duly organized to carry on governmental

functions. Some of its functions were to manage, operate, staff, train, and supervise the employees in the Hillsdale County Clerk's Office.

4.   Hillsdale County Clerk's office is responsible to be the Clerk of the Courts and deal with all election issues within its borders through Defendant County of Hillsdale, the duly authorized authority within Hillsdale County responsible for elections and election laws of the State of Michigan.

5.   At all relevant times hereto, Defendant ABE DANE was acting under color of law, under assumed authority of the Clerk under MCL50.62 in his individual and official capacities, and within the course and scope of his employment as Deputy County Clerk for the County of Hillsdale. He is being sued in his individual and official capacities.

6.   Defendant Hillsdale County Clerk's office is a municipal corporation with its principal offices located at 29 North Howell Street, #1, in Hillsdale, Michigan.

7.   Defendant County of Hillsdale is a municipal corporation with its principal offices located at 33 McCollum Street in Hillsdale, Michigan, duly organized to carry on governmental functions. Some of its functions were to manage, operate, staff, train, and supervise the employees in the Hillsdale County Clerk's Office.

8.   Hillsdale County Clerk's office is responsible to be the Clerk of the Courts and deal with all election issues within its borders through Defendant County of Hillsdale, the duly authorized authority within Hillsdale County responsible for elections and election laws of the State of Michigan.

9.   At all relevant times hereto, Defendant BRENT LEININGER was acting under color of law, in his individual and official capacities, and within the course and scope of his employment

as County Commissioner, 5th District, County of Hillsdale. He is being sued in his individual and official capacities.

10.  Defendant Hillsdale County Board of Commissioners office is a municipal corporation with its principal offices located at 33 McCollum Street in Hillsdale, Michigan.

11.  Defendant County of Hillsdale is a municipal corporation with its principal offices located at 33 McCollum Street in Hillsdale, Michigan, duly organized to carry on governmental functions. Some of its functions were to manage, operate, staff, train, and supervise the employees in the Hillsdale County Sheriff's Office (HCSO) and the Hillsdale County Clerk's Office.

12.  Hillsdale County Board of Commissioners office is responsible to be the Legislative Branch of government within its borders through Defendant County of Hillsdale, the duly authorized authority within Hillsdale County responsible for budgets, employment and training of all staff in every Department in the County of Hillsdale.

13.  At all relevant times hereto, Defendant STEPHENIE KYSER was acting under color of law, in her individual and official capacities, and within the course and scope of her employment as County Treasurer/ Election Board Member for the County of Hillsdale. She is being sued in her individual and official capacities.

14.  Defendant Hillsdale County Treasurer's office is a municipal corporation with its principal offices located at 33 McCollum Street in Hillsdale, Michigan.

15.  Defendant County of Hillsdale is a municipal corporation with its principal offices located at 33 McCollum Street in Hillsdale, Michigan, duly organized to carry on governmental functions. Some of its functions were to manage, operate, staff, train, and supervise the employees in the Hillsdale County Treasurer's Office and Election Board.

16. Hillsdale County Treasurer's office is responsible to collect revenue and pay all bills within its borders through Defendant County of Hillsdale, the duly authorized authority within Hillsdale County responsible for collecting revenue and paying the bills of Hillsdale County by the laws of the State of Michigan.

17. At all relevant times hereto, Defendant SCOTT HODSHIRE was acting under color of law, in his individual and official capacities, and within the course and scope of his employment as Sheriff for the County of Hillsdale. He is being sued in his individual and official capacities.

18. Defendant HCSO is a municipal corporation with its principal offices located at 165 W. Fayette Street in Hillsdale, Michigan.

19. Defendant County of Hillsdale is a municipal corporation with its principal offices located at 33 McCollum Street in Hillsdale, Michigan, duly organized to carry out governmental functions. Some of its functions were to manage, operate, staff, train, and supervise the deputies at HCSO, as well as the employees in the Hillsdale County Clerk's Office.

20. HCSO provides law enforcement within its borders through Defendant County of Hillsdale, the duly authorized authority within Hillsdale County responsible for enforcing the laws of the State of Michigan.

### Bianchi is Not Entitled to Judicial Immunity

21. Judges are generally entitled to absolute judicial immunity from damages for acts taken while acting in their judicial capacity.

22. However, this rule has two exceptions: (1) when the judge's actions are taken outside her role as a judge, i.e., entirely non-judicial conduct, or (2) when the judge's actions are taken in the complete absence of jurisdiction. *Leech v DeWeese*, 689 F3d 538, 542 (CA 6, 2012).

23.  The Constitution establishes a basic division of labor, distributing the governance tasks among three branches. Each branch's power is circumscribed to ensure that no one branch dominates. The judiciary is no exception. It "does not influence either the sword or the purse" and "must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments." Federalist No. 78 (Alexander Hamilton).

24.  Bianchi was operating as a member of the County Election Board and not in her official capacity as a Probate Court Judge for the County of Hillsdale, and thereby does not qualify for judicial immunity. Finally, as a matter of common sense, judicial immunity exists to protect independent judicial decision-making and limit redundant collateral attacks that belong in the ordinary appellate process. Because neither purpose is served here, granting judicial immunity makes no sense.

**Olsaver is Not Entitled to Judicial Immunity**

25.  Judges are generally entitled to absolute judicial immunity from damages for acts taken while acting in their judicial capacity.

26.  However, this rule has two exceptions: (1) when the judge's actions are taken outside his role as a judge, i.e., entirely non-judicial conduct, or (2) when the judge's actions are taken in the complete absence of jurisdiction. *Leech v DeWeese*, 689 F3d 538, 542 (CA 6, 2012).

27.  The Constitution establishes a basic division of labor, distributing the governance tasks among three branches. Each branch's power is circumscribed to ensure that no one branch dominates. The judiciary is no exception. It "does not influence either the sword or the purse" and "must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments." Federalist No. 78 (Alexander Hamilton).

28.  Olsaver's extrajudicial actions violated this basic paradigm. Additionally, Olsaver's acts were performed in the complete absence of jurisdiction. See, e.g., *Mireles v. Waco*, 502 U.S. 9, 11–13 (1991) (per curiam). Finally, as a matter of common sense, judicial immunity exists to protect independent judicial decision-making and limit redundant collateral attacks that belong in the ordinary appellate process. Because neither purpose is served here, granting judicial immunity makes no sense.

29.  At all relevant times hereto, Defendant ANDREW FINK was acting under color of law, in his individual and official capacities, and within the course and scope of his elected position as a State Representative which made him an Executive Member of the Hillsdale Country Republican Executive Committee (HCREC).

**Count I**
**Rejection of Ballots for Immaterial Errors or Omissions**
**Violation of the Materiality Provision of the Civil Rights Act**
**52 U.S.C. § 10101(a)(2)(B); 42 U.S.C. § 1983**

1.  Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

2.  The Materiality Provision of the Civil Rights Act ("CRA") prohibits disqualifying voters "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

3.  The CRA directs that "vote" in this context means "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast concerning candidates for public office and propositions for which votes are received in an election." *Id.* §§ 10101(a)(3)(A), 10101(e).

31

4.    Kast and Dane's disqualification of Plaintiffs' ballot constitutes denial of Plaintiffs'

fundamental right to vote by denying their ability to cast a ballot or have it "counted and

included in the appropriate totals of votes cast" in the 2022 election. *Id.* Doing so based solely on

the failure to flawlessly complete an affidavit of identity or being denied the ability to correct

any defect on the affidavit of identity during the seven weeks that Plaintiff was "exposed to the

public" under MCL168.554,  constitutes a denial of the right to vote "because of an error or

omission on [a] record or paper relating to . . . [an] act requisite to voting," in violation of the

Materiality Provision because omission of the date on the envelope is "not material in

determining whether" Plaintiffs were "qualified under [Michigan] law to vote. *Id.* §

10101(a)(2)(B).

5.    In Michigan, a candidate for precinct delegate must file an affidavit of identity (AOI)

with the county clerk. Section 558(2) sets forth the required contents as follows:

> An [AOI] must contain the candidate's name and residential address; a
> statement that the candidate is a citizen of the United States; the title of the office
> sought; a statement that the candidate meets the constitutional and statutory
> qualifications for the office sought; other information that may be required to
> satisfy the officer as to the identity of the candidate; and the manner in which the
> candidate wishes to have his or her name appear on the ballot. If a candidate is
> using a name that is not a name that he or she was given at birth, the candidate
> shall include on the [AOI] the candidate's full former name. MCL 168.558(2).

6.    Under Michigan law, "the entry of a date by the affiant candidate is not an express

impediment to rendering the writing a proper and valid affidavit. . ." *Stumbo v Roe*, 332 Mich

App 479, 489; 957 NW2d 830 (2020).

7.    On the deadline for the 2022 precinct delegate registration, 26 *America First* precinct

delegates were invalidated, purporting to be for errors such as the notary's date being different

than the signature date, omission of the notary's date of notarization despite being stamped over

32

the dated area where the application was signed, and the omission from marking the

"Republican" box.

8.    As set forth *supra*, Michigan law requires each delegate candidate to demonstrate

eligibility and qualification to appear as a candidate on the ballot.  Each *America First* candidate

completed their AOI in all material respects and in most examples, only omitted the date.

9.    It is undisputed that the 26 delegate registrations were turned in before the 4:00 p.m.

deadline on the date they were due. Thus, the date on which these candidates signed their AOIs

is immaterial to determining either their eligibility to vote or the timeliness of their ballots.

10.  The rejection of otherwise valid affidavits of identity for immaterial errors or omissions

is contrary to the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B) and

has and will continue to result in the disenfranchisement of a large number of Hillsdale County,

Michigan voters. Defendants' deliberate acts and omissions were the actual and proximate cause

of damages Plaintiff and many other Hillsdale County residents have and will continue to suffer.

**Count II**
**Denial of Plaintiffs' Voting Rights without Pre-Denial Notice**
**And Opportunity to Cure Application Errors**
**Violation of the Fourteenth Amendment**
**U.S. Const. Amend. XIV; 42 U.S.C. § 1983**

11.  Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

12.  At a minimum, procedural due process requires that the State provide the candidate with

a pre-deprivation notice and an opportunity to be heard before being denied their protected

liberty interest. See *Mathews v. Eldridge*, 424 U.S.319, 335 (1976). Because there is no

possibility of a meaningful post-deprivation process when a candidate's ballot access is

rejected—there is no way to vote after an election has passed—sufficient pre-deprivation process

is the constitutional imperative. See, e.g., *Martin v. Kemp*, 341 F. Supp. 3d 1326,1338 (N.D. Ga.

33

2018) ("Given that the State has provided voters with the opportunity to vote by absentee ballot, the State must now recognize that the "privilege of absentee voting is undoubtedly deserving of due process.") (internal citation and quotations omitted).

13. Defendants mailed notices to the 26 affected America First members of deficiencies on the AOI's on the last day to file, sending those letters out via USPS, full knowing that the potential candidates would not receive the letters until after the last day to file. Defendants did this even though they had all potential candidate's phone numbers.

14. Defendants' failure to ensure candidates are provided with notice and an opportunity to cure defects in their applications before rejecting them fails to meet the minimum requirements of procedural due process and is, therefore, unconstitutional.

15. Under the framework set forth in *Mathews*, courts balance three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

16. Balancing those factors here demonstrates that Hillsdale County, by rejecting precinct delegate applications without providing notice of rejection and an opportunity to cure, will deprive Plaintiffs of their fundamental right to vote in violation of the Due Process Clause. First, the private interest at stake is of the utmost constitutional importance—the fundamental right to vote. See *Harper v. Va. Bd. of Elections*, 383 U.S.663, 667 (1966). Second, the risk of erroneous deprivation is self-evident, as hundreds of voters who timely submitted ballots and thought their votes would be counted are instead disenfranchised based on failure to meet a mere

34

administrative directive that bears no relationship to the qualifications of the voters.  Third, no legitimate government interest will be furthered by enforcing the handwritten date requirement.

17.  Absent an order issued by this Court, Plaintiffs and many others throughout Hillsdale County face deprivation of their fundamental right to vote without due process of law.

### Count III
### *Monell* Liability - 42 U.S.C. § 1983

18.  Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

19.  At all relevant times, Hillsdale County failed to adequately train, discipline, and supervise Defendant Dane and [others if any], promulgating and maintaining de facto unconstitutional customs, policies, or practices rendering them liable for the constitutional violations alleged herein under *Monell v. Dept. of Social Services of the City of New York*, 436 US 658 (1978).

20.  At all relevant times, Defendants failed to establish, implement, or execute adequate policies, procedures, rules, and regulations to ensure that their actions did not create or increase the risk of Plaintiff's constitutional rights being violated.

21.  Hillsdale County explicitly and implicitly authorized, approved, or knowingly acquiesced in the deliberate indifference to the strong likelihood that constitutional violations, such as in the instant case, would occur, and pursued policies, practices, and customs that were a direct and proximate cause of the deprivations of Plaintiff's constitutional rights.

22.  In previous years, Defendant KAST had always allowed the candidate to come into her office and fix any defects to the AOI  in a timely manner, but there was a complete divergence from this practice once Defendant DANE became the Deputy Clerk, and continuing in the election cycle of 2024, Defendant DANE maintains that he may review the AOI multiple times until he finds an error even if it is just minutes before the cut off time.

35

23. By inadequately training and/or supervising their employees and having a custom or policy of deliberate indifference to the constitutional rights of their citizens, Hillsdale County encouraged and cultivated the conduct which violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution. Through this conduct, Defendants were the direct and proximate cause of the injuries Plaintiff suffered.

**Count IV**
**Content and Viewpoint-based Regulation of Speech**
**Violation of the First Amendment**
**U.S. Const. Amend. I, XIV; 42 U.S.C. § 1983; Mich Const 1963, art. I**

24. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

25. The First Amendment to the United States Constitution, as applied to state and local government agencies and officials by the Fourteenth Amendment, prohibits Congress from making laws "abridging the freedom of speech."

26. The Constitution of Michigan provides more robust protection for free speech rights by providing that "[e]very person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech." Const 1963, art 1, § 5. Speech over the Internet is constitutionally protected "'to the same extent as speech over other media.'" *Thomas M Cooley Law Sch v Doe 1*, 300 Mich App 245, 256, 833 NW2d 331 (2013).

27. Social media has become "the modern public square," where platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S.Ct. 1730 (2017). They also permit private citizens to interact directly with public and elected officials.

28. Social media platforms are akin to common carriers and public accommodations that, under longstanding statutory and common-law doctrines, should be subject to non-discrimination

rules in accessing their platforms, which discrimination based on content and viewpoint would violate.

29.  As alleged herein, Defendants have acted in concert both with each other and with others to violate the First Amendment and Article I of the Michigan Constitution by suppressing and censoring Plaintiff's freedoms of speech and expression on social media, barring his right to the freedoms of association and assembly, denying his right to engage in political discourse, and denying those in and around Hillsdale County the right to gather and receive information on matters of public concern.

30.  Plaintiff's speech and expression were protected by the First Amendment and Article I of the Michigan Constitution.

31.  The First Amendment generally prohibits laws that target speech because of the content or viewpoint expressed. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995).

32.  The Order is content- and viewpoint-based. It is content-based because it singles out speech pertaining to a group of persons or political parties based on Olsaver's specified distinctions.

33.  The Order is viewpoint-based because it only applies to speech purporting that the AF faction is the state-recognized Hillsdale County Republican Party, but not to speech claiming the Old faction is. Viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829-30.

34.  The Order is not a narrowly tailored means of achieving Hillsdale County's interest. To the contrary, there are many less restrictive alternatives, such as enforcing criminal laws and

Defendants using the marketplace of ideas to get their message across instead of having Plaintiff silenced.

35.   Hillsdale County lacks a compelling government interest in censoring and interfering with Plaintiff's protected speech. Indeed, the Order lacks even a legitimate interest.

36.   The Order is an unconstitutional content-based regulation of speech and expression.

37.   As a direct and proximate result of the Order, Hillsdale County will burden a vast amount of speech and political activity; Plaintiff and the many individuals similarly situated to him will suffer ongoing irreparable injuries, including the deprivation of their Constitutional right to publish protected speech without the undue burden imposed by an unconstitutional judge's order.

38.   Defendants and those acting in concert with them, by adopting the censorship policies and conduct identified herein, have acted without any lawful authority whatsoever and any colorable basis for exercising authority. No federal statute, regulation, constitutional provision, or other legal authority authorizes their social media censorship program, and it is wholly *ultra vires*.

### Count V
### Overbreadth
### Violation of the First Amendment
### U.S. Const. Amend. I, XIV; 42 U.S.C. § 1983; Mich Const 1963, art. I

39.   Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

40.   First Amendment overbreadth doctrine prohibits laws that regulate speech if "a substantial number of [their] applications are unconstitutional, judged about the statute's legitimate sweep." *United States v. Stevens* (quotation marks and citations omitted).

41.   The Order is facially overbroad because it chills, prohibits, or removes a substantial amount of constitutionally protected speech and compels them to voice the Defendants' pro-

censorship view. Much speech that may be perceived to violate the Order may be constitutionally protected.

42. The Order has no legitimate sweep because it seeks to chill protected speech unlawfully. Assuming *arguendo* that the Order has some legitimate sweep concerning speech that incites violence, its unconstitutional applications dwarf that legitimate sweep because the Order reaches all manner of commentary, journalism, and documentary on essential matters of public concern.

43. As a direct and proximate result of the Order's overbreadth, Plaintiff and those similarly situated will suffer ongoing irreparable injuries, including being deprived of his Constitutional right to publish protected speech and against being pressured to chill protected speech.

44. Defendants' interference with the First Amendment and state free-speech rights of Plaintiff and virtually all Michiganders is *per se* unconstitutional, and even if not, it cannot be justified under any level of constitutional scrutiny.]

### Count VI
### Unconstitutional Discrimination based on Political Affiliation
### Violation of the Fourteenth Amendment - Equal Protection Clause
### U.S. Const. Amend. XIV; 42 U.S.C. § 1983

45. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

46. The right to vote is a "fundamental political right." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 30 L. Ed. 220 (1886). Regarding Plaintiff's equal protection claim, the Supreme Court "has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972). Equal protection applies to the manner in which the franchise is exercised: "Having once granted the right to vote on equal terms, the State

may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000).

47.  The New Faction submitted approximately thirty Applications for Candidacy (AOIs), of which twenty-six were subsequently dismissed due to minor procedural irregularities. In contrast, the Old Faction lodged over seventy AOIs, with fewer than five encountering similar dismissals attributable to minor deficiencies.

48.  An individual affiliated with the New Faction sought assistance from Defendant KAST in the preparation of their AOI, while another member received aid from Defendant Dane in crafting their AOI.

49.  Each of the aforementioned AOIs, aided by the respective defendants, underwent notarization and review in mid-March. Subsequently, both AOIs were denied on the final day for submissions.

50.  Notably, none of the AOIs submitted by members of the Old Faction, which were posted on the website on the final day, were refused inclusion on the ballot. Conversely, twenty-six members of the New Faction, whose AOIs had been displayed on the website for nearly seven weeks, were denied inclusion on the August 2022 ballot.

51.  Because Defendant's discriminatory action burdened Plaintiff's fundamental rights, their actions will be subject to Strict Scrutiny review.

52.  Defendants' discriminatory action did not address a compelling state interest. Even, assuming arguendo, a compelling interest could be found Defendants' actions were not narrowly tailored to address that interest. Indeed, the discriminatory action is impermissible.

53.  Defendants' wrongful discrimination was the direct and proximate cause of Plaintiff's constitutional rights being violated. Defendant's willful, wanton, and malicious deprivations of

Plaintiff's Freedoms of Speech, Association, Expression, Due Process of law, Equal Protection

of the law, and many other fundamental and statutory rights, have cause Plaintiff to suffer

irreparable harm. Plaintiff and those similarly situated will suffer ongoing irreparable injuries,

including being stripped of their constitutional rights, denied due process of law, and

disenfranchised from voting – unless this Court takes action.

### Count VII
### Conspiracy to interfere with civil rights.
### 42 U.S. Code § 1985(3)

54. Plaintiff incorporates by reference all preceding paragraphs as if fully restated

herein.

55. Defendants KAST, DANE, LEININGER, HODSHIRE, KYSER, BIACHI,

OLSAVER, and FINK did conspire to deprive the Plaintiff of his rights outlined in the

above counts.

### Count VIII
### Action for neglect to prevent.
### 42 U.S. Code § 1986

56. Plaintiff incorporates by reference all preceding paragraphs as if fully restated

herein.

57. Defendants KAST, DANE, LEININGER, HODSHIRE, KYSER, BIACHI,

OLSAVER, and FINK had the ability and requisite power to prevent or aid in preventing

the commission of 42 U.S. Code § 1985(3) violation against the Plaintiff.

### Count IX
### Conspiracy against rights.
### 18 U.S. Code § 241

58. Plaintiff incorporates by reference all preceding paragraphs as if fully restated

herein.

59.  If Defendants KAST, DANE, LEININGER, HODSHIRE, KYSER, BIACHI, OLSAVER, and FINK are found guilty of Count VII, they have committed a criminal offense.

### **PRAYER FOR RELIEF WHEREFORE,**

Plaintiff JON PAUL RUTAN respectfully requests this Honorable Court to grant the following relief, jointly and severally liable against all Defendants, for all of the reasons set forth in the complaint above:

a) Actual and compensatory damages, in an amount to be proven at trial, for the abuse and injuries Mr. RUTAN so wrongly suffered by Defendants' unlawful, unconstitutional, and unjustified conduct.

b) Punitive and exemplary damages to the extent allowed by law for Defendants' conduct by evil motive or intent, and/or reckless or callous indifference to Mr. RUTAN's rights.

c) Court fees and time for Mr. RUTAN having to bring this action to vindicate his rights that he was deprived of, pursuant to 42 USC § 1988(b); and,

d) Interests, costs, and such other and further relief as is just and proper.


JON PAUL RUTAN
In *Pro Se*

Dated: May 8, 2024

Jon-Paul Rutan
2228 Pondbrooke Dr.
Hillodale, MI 49242

WesternJ
399 Feder
110 Mich
Grand Rap

DO No

District Federal Court

-al Building

igan NW

ids, MI 49503

T FOLD

gent

**FROM:**
JAN HUTCHINS
(517) 437-2100
HILLSDALE MARKET HOUSE
210 W. CARLETON RD.
HILLSDALE  MI 49242

LTR   1 OF /1NO ONIddIHS

MI 495 9-08

SHIP TO:
   WESTERN DISTRICT FEDERAL COURT
   110 MICHIGAN NW
   399 FEDERAL BUILDING
   **GRAND RAPIDS   MI 49503**

**UPS NEXT DAY AIR**
TRACKING #: 1Z 462 283 01 5951 4491

1

REF 1:JOHN PAUL RUTAN/517-320-1383
REF 2:2228 PONDBROOKE DR HILLSDALE, MI

BILLING:  P/P

y Air®
ide Exp
Air®
ide Exp

code
e a pic

Shipm
for the
dence,
s. UPS E
g more

al Shij
press e
n cour
port ex

or the
enve

press
dia con
sh or

lect®

WS  27.0.10 Canon MG7500  19.0A 05/2024

Fold here and place in label pouch